IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff-Respondent,

 vs.                                                CIVIL NO. 08-409 JP/LFG
                                                        CRIM. NO. 04-2147 JP

JOHN SAUNDERS,

        Defendant-Movant.

## MAGISTRATE JUDGE'S FINDINGS
## AND RECOMMENDED DISPOSITION[1]

### Findings

    1.  This is a proceeding on a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, filed April 22, 2008.  Movant-Defendant John Saunders ("Saunders") challenges the conviction and sentence entered by the United States District Court for the District of New Mexico in United States v. Saunders, No. CR 04-2147 JP.

    2.  Respondent United States filed its Response [Doc. 9] on June 26, 2008.  Saunders filed his Reply [Doc. 10] on July 31, 2008; the Government filed a "Response to Petitioner's Reply" [Doc. 11] on August 26, 2008; and Saunders filed a "Sur-Reply" [Doc. 15] on September 15, 2008.

    3.  Saunders seeks habeas relief on grounds of ineffective assistance of counsel.  He cites two instances of ineffectiveness: (1) counsel advised him to take the stand in his own defense, thereby subjecting him to cross-examination concerning his prior convictions for bank robbery; and (2) counsel failed to conduct adequate pretrial investigation and adequate cross-examination of the Government's chief witnesses, thereby failing to expose inconsistencies in their testimony.

---

[1] Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

Factual and Procedural History

4. In a grand jury indictment dated October 26, 2004, Saunders was charged with the offenses of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), and brandishing a firearm during the robbery in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  [Doc. 9 in CR 04-2147 JP].[2] Attorney Roger A. Finzel ("Finzel") of the Federal Public Defender's office was appointed to defend Saunders on these charges.  [CR Doc. 6].

5. Trial was initially set for December 6, 2004 but was continued several times.  On March 9, 2005, a Superseding Indictment [CR Doc. 25] was filed, charging Saunders and co-Defendant Jeremy Rex Burnett ("Burnett") with the above offenses.  Burnett was arrested and initially entered a plea of not guilty.  [CR Doc. 41].  On June 3, 2005, Burnett changed his plea to guilty pursuant to a Plea Agreement. [CR Docs. 54, 56].  Burnett was later sentenced to 190 days or time served, plus a term of supervised release of five years. [CR Docs. 88, 89].

6. Saunders proceeded to trial on June 6, 2005.  On June 16, 2005 the jury found Saunders guilty on both counts of the indictment. [CR Doc. 64].

7. On September 23, 2005, attorney Finzel filed a Motion to Withdraw as Counsel, stating as follows:

> 1. There is an irreconcilable conflict of interest precluding further representation of this defendant.  The conflict is of a fundamental nature so that further representation of Mr. Saunders by Assistant Federal Public Defender Roger A. Finzel is inappropriate if not impossible.  It is clear from actions taken by the defendant that he does not have any confidence in the advice or the work that Assistant Federal Public Defender Roger A. Finzel is providing, has provided or will provide.
>
> 2. The defendant has raised accusations against his lawyer that will not doubt require resolution in another court at another time, regarding this counsel's representation.
>
> 3. Mr. Saunders has a sentencing hearing currently scheduled for October 4, 2005.  He has asked this counsel to engage in various discussions with the U.S. Attorney's Office in an effort to resolve in

---

[2]Documents filed in the underlying criminal case will hereinafter be cited in the format, "CR Doc. __"; documents filed in the instant civil action will be cited simply, "Doc. ___."

> this court, matters pending in another federal court. No matter how those discussions would come out, it would create another conflict of interest for this counsel and the Office of the Federal Public Defender to continue to represent Mr. Saunders. Further representation would only magnify the claims of improper representation. The attorney-client relationship has totally broken down and there is no possibility of any reconciliation.

[CR Doc. 72, at 1-2].

8. Following a hearing, the trial judge granted the Motion to Withdraw. Sentencing was continued, and attorney Ann Steinmetz was appointed to replace Finzel as counsel for Saunders. [CR Docs. 76-79].

9. On December 19, 2005, Saunders was sentenced to a total term of imprisonment of 135 months, to run consecutively with the sentence of one year and a day imposed for violation of supervised release in CR 93-111 JP. Saunders also received a three year term of supervised release. [CR Docs. 90, 91].

10. The United States Court of Appeals for the Tenth Circuit affirmed Saunders's conviction on December 19, 2006. [*See*, CR Doc. 97]. On April 23, 2007, the United States Supreme Court denied certiorari. [*See*, CR Doc. 99]. This Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 was filed April 22, 2008.

## Discussion

### Ground One: Ineffective Assistance in Advising Saunders to Testify and Failing to Properly Prepare Him

11. Saunders alleges that, in light of conflicting testimony by police officers and other witnesses, and in the face of "highly speculative evidence," his attorney unwisely advised him to take the stand and tell his side of the story. [Doc. 1, at 9]. He says that it was only at the last minute that counsel made the decision to have him take the stand, and that he was forced testify without any preparation at all. On cross-examination, Saunders was asked about his prior bank robbery convictions. He now says that he had no idea he would be asked about the prior convictions and if he had not taken the stand, the jury would not have known about his record. [Id.; Doc. 2, at 9].

12. Saunders acknowledges that he signed a form before taking the stand, waiving his right

to remain silent and acknowledging the risks of testifying. However, he asserts that he was "coerced into signing the form." [Doc. 2, at 7]. He says he was not given an opportunity to review the waiver form before signing, his attorney did not advise him as to the contents of the form, and he had no idea what was in the form and was unaware of the consequences of signing. He says further that his attorney told him he "would hang" if he didn't take the stand. [Id.].

13. Saunders argues that these actions on the part of his attorney constituted ineffective assistance since there was no eyewitness evidence against him, and the Government's case was based on sparse evidence and the testimony of unreliable witnesses. In this situation, he contends, it was not an objectively reasonable trial strategy for his attorney to advise him to take the stand, particularly when to do so would permit the Government to bring up his prior bank robbery convictions. [Doc. 2, at 10].

14. The Government attached to its Response the Affidavit of attorney Finzel [Doc. 9, Ex. 1]. In this affidavit, Finzel directly contradicts Saunders's assertion that he advised Saunders to testify. To the contrary, Finzel says that from the beginning of the case, Saunders was informed that he did not have to testify; however, Saunders insisted from the beginning that he wanted to tell his side of the story. [Id., at 2].

15. Finzel states further in his affidavit that he discussed with Saunders, on numerous occasions, the pros and cons of testifying. He says he helped Saunders prepare for both his direct testimony and cross-examination. He also brought in another lawyer from the Office of the Public Defender to help Saunders prepare for cross-examination. [Id.].

16. After two days of trial, Finzel says, he again asked Saunders about his desire to testify, reminded him that he did not have to testify, and told Saunders that he did not think it would be a good idea for him to testify. Finzel says that Saunders replied angrily that he did want to testify, and that he felt that counsel had not properly prepared him to do so. [Id., at 2-3].

17. Saunders took the stand on June 15, 2005. Finzel says he conferred with Saunders that day and again questioned his decision to testify. He says further that he reminded his client that he

didn't have to testify, but that Saunders continued to express the desire to do so. [Id., at 3]. When he took the stand, Saunders stated under oath that he understood he did not have to testify, and that it was his choice to do so. [Trial Transcript, at 987-88 (hereinafter cited in the format, "Tr. 987-88")]. On direct examination, Saunders discussed his background and the prior convictions.

18. Finzel says that he and Saunders discussed at length the defense strategy for his testimony about the prior convictions. Finzel says the questions Saunders faced at trial were not new to him. He states further that Saunders had been informed that if he testified, his prior convictions would be revealed to the jury, and he would be subject to vigorous cross-examination by the Government. Finzel says he told his client that he had the option of "putting his best foot forward" and revealing the prior convictions before the Government had the chance to bring them up on cross-examination, and that Saunders approved of this approach. [Id., at 3-4].

19. In sum, Finzel states that the decision to testify was made by Saunders on his own, after considerable discussion, and against the advice of counsel and of his family. [Id., at 4].

20. In his Reply, and again in his "Sur-Reply," Saunders contradicts the assertions made in Finzel's affidavit. He says that Finzel "strenuously" and "forcefully" advised him to testify, in spite of the previous convictions. He says counsel never discussed with him the pros and cons of testifying, and that at no time did Finzel help him prepare for either direct or cross-examination. He says further that Finzel repeatedly warned him that he would be "hanging himself" if he did not take the stand. [Doc. 10, at 2-3; Doc. 15, at 2].

21. Saunders acknowledges that another attorney was called in to consult with him, but this was done only after Saunders told Finzel that he had no confidence in his representation and wanted him removed from the case. Saunders feels that the other attorney was called in "only to persuade Saunders not to fire Attorney Finzel." [Doc. 10, at 4].

22. Even if counsel had advised him of the "pros and cons" of testifying, Saunders argues, such advice would constitute ineffective assistance, as there were no "pros" to testifying, given the sparse evidence of guilt and lack of eyewitness identification. [Doc. 10, at 4, 7; Doc. 15, at 3].

23. The Government included with its Response to Petitioner's Reply [Doc. 11] the Affidavit of Thomas B. Jameson ("Jameson"). Jameson states in the affidavit that he is Finzel's co-worker and has been employed with the office of the Federal Public Defender in Albuquerque for the past 15 years. Jameson says that during Finzel's preparation for trial in Saunders's case Finzel asked him for assistance, telling him that Saunders was insisting on taking the stand in his own defense in spite of the risks, including the existence of prior convictions for bank robbery. Jameson says that Finzel asked him to meet with Saunders to discuss the concept of direct and cross-examination in the case. Jameson agreed to do so. [Doc. 11, Ex. 1].

24. Jameson says he discussed with Saunders his decision to testify at trial, the possible implications of that decision, and the advantages and disadvantages of such testimony. Jameson says that Saunders was insistent that he wanted to testify in his defense and was willing to accept the risks. He states that Saunders expressed the opinion that his testimony about the prior convictions would strengthen his credibility with the jury. Saunders's theory was that the jury would realize that he was willing to plead guilty in the past when he really was guilty of bank robbert; thus, his decision to plead not guilty in this case must mean that he did not rob the bank as the Government contends. Jameson says he had concerns about that strategy and shared them with Saunders but that Saunders was insistent on testifying. [Id., at 2].

25. Jameson states further that he helped Saunders prepare for trial, discussing with him how he could best present himself to the jury and practicing both direct and cross-examination questions. He says that at the conclusion of the meeting, Saunders seemed to be aware of techniques he could use to best communicate the facts of his case. He also states that Saunders seemed to be aware of the potential disadvantages of testifying at trial. [Id., at 2-3].

26. Jameson says that he was left with the impression that Saunders understood that it was his decision, and his alone, whether or not to testify at this trial. He says further that Saunders never said that Finzel was directing him to testify; to the contrary, Jamesson says, Saunders told him that Finzel was advising against it. [Id., at 2-3].

6

27. To establish ineffective assistance of counsel, Saunders must make a two-pronged showing; (1) that counsel's performance was constitutionally defective; and (2) that the deficient performance prejudiced his defense in that counsel's errors were so serious as to deprive the defendant of a fair trial with a reliable result. Strickland v. Washington, 466 U.S. 668, 687 (1984). To prove deficient performance, Saunders must overcome the presumption that counsel's conduct was constitutionally effective. Duvall v. Reynolds, 139 F.3d 768, 777 (10th Cir. 1998). Scrutiny of counsel's performance must be "highly deferential" and must avoid the distorting effects of hindsight. Miles v. Dorsey, 61 F.3d 1459, 1474 (10th Cir. 1995). In order to be found constitutionally ineffective, counsel's performance must be shown to have fallen below an objective standard of reasonableness. Strickland, at 687-88. In addition, the burden is on petitioner to show prejudice – that is, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id., at 694.

28. Saunders makes a sufficient showing on the "prejudice" prong of the Strickland test regarding the possibility that the result of his trial would have been different had he not taken the stand and opened the door to evidence of his prior convictions. He argues at length that the evidence against him was circumstantial and speculative and points to contradictions in the testimony of Government witnesses, implying that the Government failed to make a sufficient case for conviction and that his testimony was not necessary and indeed, was dangerous. Both Finzel and Jameson stated in their Affidavits that it was a bad idea for Saunders to testify, due to exposure of the prior convictions; they both say they advised strongly against it.

29. However, there remains a factual dispute as to what Finzel's advice actually was. Saunders's statement that Finzel forcefully encouraged him to testify at trial and coerced him into signing the waiver of his right to remain silent is directly contradicted by Finzel's statements in his affidavit, and those of Jameson in his, to the opposite effect. When factual disputes and inconsistencies beyond the record exist, an evidentiary hearing is necessary. Moore v. United States, 950 F.2d 656, 660-61 (10th Cir. 1991).

30. The Court will not order an evidentiary at this time in light of the recommendation that Saunders's claim under Ground Two should be dismissed, as discussed below. Both parties will be given the opportunity to submit any objections they may have to this recommended disposition. Once the Court reaches a final disposition of the issues, an evidentiary hearing will be scheduled if necessary.

<u>Ground Two: Ineffective Assistance in Failing to Expose Inconsistencies
in the Testimony of the Government's Chief Witnesses</u>

31. Saunders next argues that counsel was ineffective in failing to conduct adequate pretrial investigation and failing to adequately cross-examine the Government's chief witnesses, thereby failing to expose inconsistencies in their testimony. The Court finds that Saunders has failed to demonstrate ineffective assistance on this ground and recommends that this claim be dismissed.

32. Saunders contends that the Government's chief witnesses, Albuquerque Police Detective Michael Hill ("Hill") and FBI Agent John Pierson ("Pierson"), fabricated or embellished their testimony. He says that the testimony of these two witnesses was inconsistent with each other's and with that of other eyewitnesses to the crime, and was also inconsistent with their own earlier reports of the crime and investigation of Saunders's activities.

33. Saunders argues that if attorney Finzel had more thoroughly reviewed the official reports filed by these two witnesses, he would have discovered ample information with which to contradict their trial testimony. He also contends that Finzel failed to conduct pretrial investigation which would have revealed witnesses who could testify that Saunders does not smoke and never has, which would have contradicted Hill's testimony that he saw Saunders step out of a white van and smoke a cigarette.

34. Saunders says further that Hill testified he conducted surveillance of Saunders's place of work, a car dealership, from a position in an adjacent parking lot which in fact did not offer such a view. He says Hill also testified as to certain entrances and exists to and from the car dealership which in fact do not exist. If Finzel had investigated these matters prior to trial, Saunders argues, he could have raised these inconsistencies on cross-examination and demonstrated that the officers

"concocted" their testimony, and there is a reasonable probability that the result of the trial would have been different.

35. In his affidavit, Finzel states that he did in fact investigate all of the matters which Saunders alleges he did not investigate, and that the trial transcript shows that he explored these matters at trial. [Doc. 9, Ex. 1, at 4]. The Government notes that Finzel cross-examined every witness called by the United States, drawing into question evidence pointing to defendant's guilt, the particular witness's recollection and/or prior inconsistent statements, and the lack of a thorough police investigation. Even if counsel had asked different questions, the Government adds, there is no guarantee that the jury would have returned a verdict of not guilty.

*Pierson's Testimony*

36. On direct examination, FBI Agent Pierson testified that he received a tip which led to surveillance of Saunders, on suspicion that he was planning a bank robbery. FBI agents followed Saunders between his home, his place of employment, and a storage locker located in the neighborhood of the bank that was later robbed. Pierson said further that once he confirmed that Saunders was the owner of the storage unit, he set a video camera on a pole near the unit and filmed Saunders coming and going. He said he also saw Saunders approach the storage unit on a motorcycle on one occasion. [Tr. 112-124].

37. Pierson testified further that on October 1, 2004, he received a call from an Albuquerque Police Department ("APD") detective, informing him of the bank robbery near Wyoming and Menaul in the vicinity of Saunders's storage unit. He said that he immediately went to the pole camera, pulled the videotape and replaced it with another, and took the tape back to the FBI office to view it. Pierson identified the videotape, and it was admitted into evidence. The jury viewed the tape while Pierson testified about what was on it.

38. The videotape showed a white minivan approaching the storage unit and stopping. The driver, a white male, got out of the van and went inside the storage unit. Pierson said he thought this person could be Saunders. The man who got out of the van was dressed in a light-colored short-

9

sleeved shirt and dark slacks.  He was in the storage unit for about two to four minutes.  When he emerged, he was dressed in a dark, long-sleeved top, jeans and white sneakers.  The man left in the white van and shortly thereafter returned, went into the storage unit again, and emerged wearing a dark full-faced motorcycle helmet with a visor.  He backed a motorcycle out of the unit and drove off on it.  The man on the motorcycle returned to the storage unit at approximately 10:47 a.m., went back into the storage unit, emerged wearing the light colored short-sleeved shirt and dark slacks and carrying a small, dark item in his right hand.  He then drove away in the white van at 10:49 a.m.  [Tr. 124-135].

      39.  Testimony from bank employees established that the bank was robbed between 10:45 and 10:50 a.m. on October 1, 2004 by a gunman who drove up to the bank on a motorcycle and was wearing a full-faced motorcycle helmet, jeans, tennis shoes, gloves and a gray, long-sleeved T-shirt or sweatshirt.  [Tr. 54-55, 84-85, 92, 96, 99].

      40.  Pierson identified Saunders as the person on the video tape who arrived at the storage unit in a white van, changed clothes inside the unit, rode off on a motorcycle, returned shortly thereafter, went inside the storage unit again and emerged wearing a light short-sleeved shirt and dark slacks and carrying a small item, and drove off in the white van.  Pierson stated that other FBI agents and APD officers were dispatched to the bank, to Saunders's storage unit, and to the car dealership where Saunders worked.  Pierson says he obtained an arrest warrant and search warrants based on the videotape evidence.  A search of Saunders' storage unit revealed guns, a motorcycle, a dark full-faced motorcycle helmet, a pair of jeans, a gray, long-sleeved pullover shirt, a white T-shirt, and a pair of white tennis shoes. [Tr. 147-71].

      41.  Pierson also identified photographs of the storage unit at the time of search, as well as photographs of Saunders taken at the FBI office on October 1, 2004.  In the photograph, Saunders was wearing a short-sleeved light colored shirt, and Pierson testified that he was so dressed during questioning after his arrest.  [Tr. 176-81].

      42.  On cross examination, Finzel brought out that Pierson was 80 to 100 yards away and five

stories up on the day he says he saw Saunders approach the storage unit on a motorcycle. He also brought out that the tip that caused the police and FBI to begin surveillance of Saunders was anonymous. [Tr. 191-194]. Finzel used Pierson's testimony at the preliminary hearing to impeach his estimate as to how long after the robbery Saunders was seen back at work. [Tr. 197-200]. Finzel brought out that although approximately $8,000 was taken from the bank during the robbery, the money found in the white van amounted to only about $4,000, and no large sums of money were found on Saunders's person or in his car at the time he was arrested. [Tr. 206, 219-20].

43. Pierson stated under Finzel's questioning that Saunders's co-defendant Burnett, who testified against him, had a history of drug abuse, fled after being indicted, and later agreed to testify against Saunders in exchange for lenient treatment. [Tr. 206-09]. Finzel got Pierson to state that fingerprint analysis was not sought on a nylon gun holster found in the storage unit, nor on the money retrieved from the white van, nor inside the white van itself. [Tr. 210-211, 221]. Under Finzel's questioning, Pierson also acknowledged that no police officers ever told him that they saw Saunders drive up to the car dealership shortly after the robbery in a white van. [Tr. 219].

### *Hill's Testimony*

44. On direct examination, APD Detective Hill testified that in September 2004 he was working with the FBI, conducting surveillance on Saunders. He said that on October 1, 2004, he heard a dispatch from APD radio that a bank near Wyoming and Menaul in Albuquerque had been robbed by a man who escaped on a speed-type motorcycle. From his surveillance, he knew that Saunders had the type of motorcycle described and kept it in a storage unit near the bank. Hill said that he went to Saunders's place of employment, a used car dealership, where he noticed Saunders's car in the parking lot. He stated that he then took up a position where he could see Saunders's car and the front entrance to the building where Saunders worked. [Tr. 601-10].

45. Hill testified further that, about 15 or 20 minutes after he arrived, he saw a white van circle around from the back to the front of the car dealership and park close to Saunders's car. He said that he saw Saunders get out of the van on the passenger side and go into the front entrance of

11

the building. He said he saw another person in the driver's seat of the van but did not see where that person went. As he continued to watch, Hill testified, he saw Saunders come back out of the building and "kind of stand at the door a couple of times. It might have been smoking a cigarette. I don't know." Hill stated further that he had the white van under continual surveillance until FBI agents arrived and took custody of it. No one returned to the van during the time he was watching. [Tr. 610-12].

46. On cross-examination, Finzel asked Hill to clarify exactly where he was posted during the surveillance at the car dealership, asked him to explain the entrances and exits to the parking lot about which he'd testified on direct examination, and questioned whether Hill actually had an unobstructed view of the entrance to the dealership from his vantage point at the restaurant parking lot next door. [Tr. 614-28]. Finzel brought out that Hill never filed a report on his surveillance of Saunders. [Tr. 616-18]. Finzel asked Hill to make drawings to supplement his description of the parking lot entrances and exits and his surveillance vantage point. [Tr. 625-29].

47. Finzel cross examined Hill with respect to his testimony that, after Saunders left the white van and went back inside the car dealership, he reappeared now and then outside the entrance to the building. That cross-examination went as follows:

> Q. And then you said you saw that same person coming outside during the morning smoking.
>
> A. Yes.
>
> Q. You're sure of that?
>
> A. Yes.
>
> Q. Couldn't be mistaken?
>
> A. I don't know if he was smoking. There were others outside smoking, and he would come out. It would seem like people would take smoke breaks outside. I don't know that he actually smoked.

[Trial Tr. at 621-22].

48. Saunders's specific complaints with respect to the witness Hill are that Finzel failed to conduct pretrial investigation and therefore did not bring out on cross-examination the

12

inconsistencies between Hill's testimony and his earlier police report, and that Finzel failed to present witnesses who could testify that Saunders does not smoke and never did, thus undermining Hill's testimony that Saunders stepped outside to have a cigarette.

49. Finzel did not call witnesses to present testimony that Saunders was not a smoker. This was not ineffective assistance of counsel. Hill never testified that he saw Saunders smoking; rather, he said that he saw Saunders come in and out of the building, saw other people do the same, and thought that they were smoking. Hill stated he did not specifically see Saunders himself smoking and stated he doesn't know that Saunders actually smoked that day. [Tr. 611, 621-22]. Separate testimony from other witnesses as to Saunders's smoking habits, or lack thereof, would not have undermined Hill's credibility as Hill never stated that he saw Saunders smoking.

50. Finzel's questions were designed to demonstrate that Hill may not have been observing the scene very carefully, as Hill admitted that he was not sure whether Saunders was or was not smoking. This is a reasonable method of cross-examination and does not constitute ineffective assistance of counsel.

51. With respect to the allegation of failure to conduct pretrial investigation, Saunders does not explain in what way these witnesses' police reports were inconsistent with their testimony at trial, nor how the two witnesses' statement were inconsistent with each other, nor how revelation of any such inconsistencies would have made a difference in the result. Without such a showing, Saunders fails to establish ineffective assistance.

52. The Supreme Court set forth the general standard for effective assistance with respect to pretrial investigation in Kimmelman v. Morrison, 477 U.S. 365, 384 (1986):

> 'counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case' . . . . Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, we noted that 'counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary' [*quoting* Strickland, at 690, 691].

53. In order to prevail on an ineffective assistance claim based on a failure to investigate or

13

failure to call witnesses the petitioner now claims should have been called, petitioner must show not only that counsel behaved unreasonably but also that the defense was prejudiced by counsel's actions. Nguyen v. Reynolds, 131 F.3d 1340, 1347-49 (10th Cir. 1997). It is not enough to show there was some evidence that trial counsel failed to investigate; rather, petitioner must demonstrate that the failure to investigate was objectively unreasonable and that the investigation he claims should have been done would have produced a different result at trial. United States v. McMahon, No. 04-5011, 2005 WL 115506, at *9 (10th Cir. Jan. 20, 2005). Evidence not presented at trial which at most would have diminished the credibility of an officer's testimony, or factual discrepancies not raised which do not go directly to the ultimate issue, are highly unlikely to have resulted in a different outcome. Id., at *9-10.

54.  Furthermore, the decision whether to call a witness generally rests within the sound discretion of trial counsel, Jackson v. Shanks, 143 F.3d 1313, 1320 (10th Cir. 1998), and such decisions involving trial tactics and strategy are "virtually unchallengeable." Strickland, at 690. It may be error to fail to call a witness in some limited situations, for example, "when that witness would present the only defense available." United States v. Miller, 643 F.2d 713, 714 (10th Cir. 1981). But there is no error where the witness's testimony would only be cumulative, Id., or where "it is at least as reasonable, and maybe more so, to speculate that the testimony of those witnesses would have damaged defendant's case, given the possibility of harmful statements . . . and their vulnerability on cross-examination." United States v. Snyder, 787 F.2d 1429, 1432 (10th Cir. 1986). Furthermore, "[c]ounsel's selection of questions [for a witness] is a matter of 'strategic choice,' as to which he has broad latitude." Id..

55.  It is apparent from Finzel's cross examination of these two witnesses, and other witnesses at trial, that he undertook adequate pretrial investigation. For example, he used Pierson's prior statements to undermine the credibility of his trial testimony [Tr. 197-200]; he used evidence of Pierson's interview with witness Jeremiah Herrera to question some of Herrera's testimony [Tr. 554-56]; and he cross examined Special Agent Benedict B. Bourgeois of the FBI, using the agent's

report of items he seized from the white van [Tr. 717-23]. As noted above, Finzel extensively cross examined Hill as to his ability to observe the comings and goings at the car dealership and the accuracy of his knowledge of the layout of the parking lot there. It is further apparent from the cross examination that Finzel was sufficiently familiar with the physical setting so as to raise doubts about Hill's knowledge and memory. Finzel also brought out in his cross examination of Pierson that neither Hill nor any other APD officer told him they saw Saunders arrive at the car dealership in a white van; thus, Finzel did in fact highlight inconsistencies between the officers' testimony.

56. All of the above indicates that Finzel did his homework and put it to effective use in cross examination. Petitioner has not pointed to any specific evidence that Finzel failed to uncover which would, to a reasonable probability, have turned the tide at trial; nor has he pointed to any particular testimony by persons whom Finzel failed to call as witnesses, which would have changed the outcome. Martinez v. Tafoya, 13 Fed. Appx. 873, 877 (10th Cir. 2001) (petitioner must make a "specific, affirmative showing that absent witness's testimony would have affected the outcome of the trial").

57. Counsel conducted effective and informed cross examination, and the Court rejects Saunders's allegation of ineffective assistance in this regard.

## Conclusion

The parties will be given ten days within which to submit objections to these Findings. If the District Judge adopts these Findings and Recommended Disposition, an evidentiary hearing will be scheduled on the issue of Finzel's advice to Saunders with respect to testifying at trial.

## **Recommended Disposition**

That Defendant-Movant Saunders's claims of ineffective assistance in failing to investigate and properly cross examine witnesses be dismissed with prejudice, and that the claims of ineffective assistance in allegedly advising Saunders to testify at trial be explored in an evidentiary hearing.

*Lorenzo F. Garcia*
Lorenzo F. Garcia
Chief United States Magistrate Judge